Opinion delivered March 18, 1889.

No. 2725.

A. P. Thurmond v. The State.

1. Practice — Change of Venue.— The trial court, of its own motion,
changed the venue from V. county, in which the indictment was pre-
sented, to D. county, whereupon the defendant, in the district court
of V. county, moved to vacate the said order, and requested the venue
to be changed to another than D. county, upon the ground that an
influential combination, etc., existed against him in D. county. The
court overruling the motion and denying the request, the defendant
excepted. *Held* that the ruling of the court was not error. The rem-
edy of the defendant was in the district court of D. county, from which,
upon a showing of sufficient cause, he would have been entitled to a
change of the venue.

2. Same — Evidence to Sustain Reputation — Predicate.—The State
introduced a witness who testified to a confession made by the accused,
and subsequently introduced witnesses to support the reputation for
truth and veracity of the witness by whom the confession was proved.
Those witnesses testified that for several years preceding the removal
of the said witness (about eighteen months before the trial) they lived
in the same neighborhood with him. The defense objected that this
evidence did not establish the necessary predicate for the supporting
testimony. But *held* that the predicate was sufficient.

3. Same—Impeaching Testimony—Charge of the Court.—It is only
under extraordinary or peculiar circumstances that it is proper for the
trial court to instruct the jury as to the law governing impeaching tes-
timony, and the failure of the court to do so in this case was not error.

4. Same. — A witness for the defense testified that he saw the killing;
that one Owens and not defendant shot and killed the deceased, and
that the defendant was not present at the time of the killing. The

State produced several witnesses who testified that the reputation of the said defense witness for truth and veracity was infamous. To support the credibility of its said witness, the defense offered to prove that he testified to the same facts on previous trials involving the same subject matter. *Held* that the rejection of the said proposed proof was correct.

5. SAME—REASONABLE DOUBT.—The charge of the court on the doctrine of reasonable doubt is sufficient if it applies the said doctrine to the whole case.

6. SAME—CORROBORATION OF ACCOMPLICE TESTIMONY.—See the statement of the case for a charge of the court upon the law applicable to the corroboration of accomplice testimony, *held* sufficient.

7. SAME.—Upon the ground that it was warranted neither by the indictment nor the evidence on the trial, the defense excepted to the charge of the court to the effect that the jury might convict if they believed that Owens killed the deceased, and that defendant was present, and, knowing the unlawful intent of Owens, aided him by act or encouraged him by word or gesture in the commission of the act. *Held* that the legality of such charge can not be made to depend upon a corresponding allegation in the indictment, and that the evidence on the trial fairly raised the issue; wherefore the charge was correct.

8. SAME—ACCOMPLICE TESTIMONY.—The defense requested the following special instruction: "You are further instructed that, if you believe from the evidence that the witness Owens was testifying to save himself from punishment or moral obliquy of guilt, then his testimony can not be convicted upon, unless corroborated as the evidence of an accomplice." *Held* that the court did not err in refusing the instruction.

APPEAL from the District Court of DeWitt, on change of venue from Victoria. Tried below before the Hon. H. C. Pleasants.

The appellant in this case was convicted in the second degree for the murder of Lewellen Sloan, on the third day of January, 1887, in Victoria county, Texas. The penalty assessed against him was a term of fifteen years in the penitentiary. The venue of the case was changed from Victoria to DeWitt county, by the court of its own motion.

T. A. Cahill was the first witness for the State. He testified that he lived in the town of Victoria, Texas, in January, 1887, and was employed at that time as a private night watchman at what was then known as the Wertheimer, but is now known as the Schwartz corner. After supper, on the evening of January 3, 1887, the witness stepped into Sitterlee's saloon, in Victoria, and there met the deceased, who was very much un-

der the influence of liquor, and, as usual, when in such condition, he was very boisterous and disorderly. Louis Sitterlee, one of the proprietors of the saloon, requested the defendant, who was present, and who at that time was a deputy sheriff, to keep deceased out of the saloon. Defendant agreed to do so.

The witness then left the saloon but soon returned, finding the deceased flourishing a pistol and creating a disturbance. The defendant was then standing near the deceased. Witness called his attention to deceased's conduct and pistol. Defendant replied that he cared nothing for the deceased's pistol. Soon afterwards George Williams succeeded in getting the pistol away from deceased, and deceased turned and appealed to the defendant to recover his pistol for him. Defendant replied to him: "You don't need a pistol." Soon after this the witness left Sitterlee's saloon, met city marshal Ragland, and reported to him that deceased was drunk and disorderly and ought to be locked up. Ragland then got defendant and the two went to Jecker's saloon, whither the deceased had gone from Sitterlee's saloon. Witness followed. Deceased was found at the bar of Jecker's saloon, talking with John Dyson. Ragland and defendant seized deceased and escorted him out of the saloon, followed by witness and Ed Sitterlee and R. L. Owens. After they got outside defendant asked Ragland if the calaboose was a safe enough place to confine deceased. Ragland replied that it was not, when, at the suggestion of defendant, they took deceased to the jail, and put him in the sheriff's private office. When the jail was reached, deceased several times appealed to Ed Sitterlee and others present to become bail for him so that he might be released. Ragland replied to that appeal that he would not take bond. Defendant, addressing deceased, said: "Sloan, behave yourself now, and I will get you a bond that Ragland will have to take." Deceased replied to defendant: "Al., I know you are my friend." Defendant then closed the door, leaving the deceased in the office. Witness told defendant that if he left deceased alone in the office he, deceased, would "break things up." Defendant replied: "No he won't. He thinks I am going to get bond for him and will be quiet." Witness and defendant then went to Jecker's saloon, where defendant requested witness to write a note for him to his uncle, sheriff C. L. Thurmond, to send him the keys to the jail cells. R. L. Owens, who was present,

proffered to and wrote the note, which was dispatched to the sheriff by Luis Garza.

A short time afterwards the witness, while standing on the street, saw somebody moving about the jail yard with a lantern. He then went to Sitterlee's saloon, where he found the defendant playing cards. He and defendant went to the jail, where they found sheriff Thurmond, swearing and cursing in a violent manner. He, sheriff Thurmond, turned on defendant and abused him severely for putting deceased in his office, and declared that deceased had set fire to and burned valuable papers and books pertaining to his office, and that he, the sheriff, was ruined, as those papers could not be replaced. Papers were then burning in the office, and, in the confusion which attended the efforts of the parties present to rescue some of them from the fire, the deceased escaped. About that time some person reported that deceased had gone in a westerly direction from the jail, and the witness and Ragland went a short distance in that direction in pursuit of deceased. Failing to find or hear anything of him, Ragland said: "He has gone home. Let him go; I have no place to put him, any way." Witness and Ragland then returned to the jail, and found old man Thurmond still abusing the defendant for putting the deceased in the office. Witness then called defendant out and advised him to let the old man alone for the present. Defendant replied that the occurrence pained him very much. He and witness then went from the jail to the court house yard gate, where they met Ragland, R. L. Owens and Luis Garza. At the same time witness observed another man, whom he did not recognize, and whose identity he has never yet fixed, standing under a tree, a short distance from the said gate. Witness again cautioned defendant to say nothing to his uncle, the sheriff, for the present, and left defendant and Owens and Garza at the said gate, and with Ragland went back to town.

At a later hour on that night the witness was informed that some shots had been fired in the vicinity of the jail. He started hurriedly to the jail, overtook Ragland, and went with him to the court house, in the yard of which, near the cistern, they found sheriff Thurmond with a lantern. Witness asked him where the shooting occurred. He pointed towards the northwest corner of the court yard, and said: "Over there." Witness and Ragland went in the direction indicated. Witness mounted the west fence of the court house yard, and from the

top of that fence saw the dead body of the deceased lying in the street. He then called to sheriff Thurmond: "Here he is, dead." Sheriff Thurmond replied: "Don't touch him. I will be there in a minute." Sheriff Thurmond soon arrived, when the body and the space around it were unsuccessfully searched for a pistol or other weapon. The coroner was then sent for, and witness went back to his post at the Schwartz corner. En route the witness met defendant, who asked him if it was true that Sloan was dead? Witness replied that it was, to which defendant replied: "Oh! You are joking!" Soon afterwards, at a point near Sitterlee's saloon, witness met Owens, who asked him if it was true that Sloan was dead, and who, on being answered in the affirmative, said, "you are joking."

Witness next met the defendant about four o'clock a. m., on Main street near Levy's corner. He was with Ragland. With those two parties the witness walked towards Regan's corner. The subject of Sloan's death came up, when witness remarked that Sloan brought his death upon himself. Defendant replied: "You are wrong, Cahill. I knew Sloan well. I went to school with him, and I know he was a good boy. I have been in a great deal of trouble, Mr. Cahill, but this is the worst I ever had. If I had a million dollars I would give it all to get my uncle out of his trouble by restoring his papers destroyed by Sloan." The witness directed but little attention to the man he saw behind the tree near the court house steps. The witness walked from the jail to the court house fence with defendant and Owens, but did not hear defendant propose to Owens to pursue defendant just after his escape, nor did he hear Owens, in reply to defendant's question: "Can we catch him?" reply: "If any two men can, we can." Sloan and Owens were not friendly at all times. They alternately quarreled and associated on friendly terms. The witness, several months prior to the killing, heard Sloan say that he could "whip all the Thurmonds, beginning with the sheriff and ending with the defendant." The defendant, who was present, told Sloan to "hush up"; that he, Sloan, did not know who his friends were. The witness never heard the defendant utter a threat against the deceased. Defendant and Sloan associated with each other a great deal, and appeared to be close friends. Sloan was a very quarrelsome man when drunk or drinking. When found, the body of Sloan lay north and south—the head south.

Henry Ragland testified, for the State, that he was city mar-
shal of Victoria at the time of Lewellen Sloan's death.  About
ten o'clock on the fatal night, the witness was notified that
Sloan was drunk and disorderly.  Witness then went to Sitter-
lee's saloon, and was informed that Sloan had just left and
gone to Jecker's saloon.  He found defendant at Jecker's
saloon, and called on him to help arrest Sloan, who was bois-
terous and disorderly.  This witness's narrative, as to what oc-
curred from the time of Sloan's arrest until his dead body was
found, was substantially the same as that of the witness Cahill.
Continuing his testimony, the witness said he met the defend-
ant and Owens about the time that Cahill did, and heard both
defendant and Owens ask Cahill if Sloan was dead, and, on
being assured that he was, replied that Cahill must be joking.
He also heard defendant tell Cahill that he was wrong in say-
ing that deceased brought his death on himself, and that he,
defendant, had lost his position as deputy sheriff by reason of
the deceased burning the papers of the sheriff, and that the
sheriff had taken the office keys from him.  On one occasion,
after the killing, Owens, then drunk, began to tell witness
something about the killing, but some person joined them at
the time, and that prevented the disclosure—if it was to have
been a disclosure.  Defendant and deceased spent a large part
of their time together on apparently the most friendly terms.
Deceased and Owens frequently quarreled, but as often ap-
peared to "make up."  Sloan's body lay with the head south
and feet north when witness saw it.  Witness saw one bullet
hole in the head and another in the breast.

E. A. Perrenot testified, for the State, that, at the time of the
killing of deceased, he lived in what was known as the King
house, which house was separated from the Ashworth place by
an open lot.  Not long before the shooting on the fatal night,
the witness was awakened by the barking of a small dog in
his house.  Soon afterward he heard a loud halloo which ap-
peared to come from the remote corner of the vacant lot.  He
then got up, and soon heard the murmur of voices which indi-
cated that two or more persons were going down the street
from the direction of Mrs. Borden's house toward that of Klein.
Klein's said house was across and down the street from wit-
ness's house.  When the parties reached a point near Klein's
house the witness heard a voice, which he recognized as the
voice of deceased, utter the supplication: "Boys, don't do me

that way." Other voices responded but in a tone too low for witness to understand what was said, or to form an idea as to who were speaking. The witness could only judge that there were more than one person with Sloan, by the fact that Sloan's appeal to the "boys" distinctly addressed the plural. The witness, a few moments later heard Sloan's voice at Jane Davenport's gate. He could not distinguish what was said, but from the tone of the voice was satisfied that Sloan was supplicating or apologizing to some body. A few moments later the witness heard three shots which sounded as if fired about the Barnes corner, which was distant from Jane Davenport's gate the width of the block. There was a short interval between two of the shots, but whether between the first and second or second and third, the witness did not remember. From the witness's house to Jane Davenport's gate the distance was about one hundred yards. It was about one hundred and seventy-five yards from the witness's house to Mrs. Borden's place. From where the witness stood on the gallery to the nearest point in the street passed over by Sloan and the persons with him, the distance was about sixty-five feet. No names were called by any of the parties, so far as the witness heard. He recognized none of the parties except Sloan, and recognized him only by his voice. He did not hear the words: "Don't Al.," uttered at Jane Davenport's gate.

Larkin Moore testified, for the State, that he was at Jane Davenport's house on the night of and at the time of the killing of Sloan. Just before the shots were fired Louis Davenport, Jane's husband, and Solomon Gibson were playing cards, and witness and Jane were sitting near the stove, Jane with her head resting in her hands. Witness heard voices at the Davenport gate a few minutes—perhaps as long as thirty minutes—before the shots were fired. One voice said: "Al., don't!" Witness did not recognize that voice. Jane Davenport remarked to her husband: "That is Al. Daniels, who was here this evening. He is coming back with somebody drunk; don't let him come in." Neither Jane nor her husband got up and went out of the house. It was a cold night, and all the doors and windows of the house were closed. Al. Daniels was a negro commonly called "Al.," who lived in Victoria.

R. L. Owens was the next witness for the State. He testified that he was present and witnessed the killing of the deceased by the defendant on the night of January 3, 1887. The wit-

ness walked into Sitterlee's saloon early on the said night, at
which time a great deal of disorder and confusion was prevail-
ing in said saloon. Witness asked Louis Sitterlee, one of the
proprietors, why he did not preserve order. He replied that all
of the deputy marshals, including the deceased, were drunk,
and that he could not maintain order. He, Sitterlee, then asked
the defendant, who was present, if he was not a deputy sheriff.
Defendant replied that he was. Sitterlee then requested de-
fendant to preserve order in the saloon. Defendant thereupon
summoned witness as a posse, remarking that he did not like
to undertake to preserve order without aid. About that time
the deceased came to the table where the witness and Woods
were playing cards for drinks, and asked the witness if he
could not treat. Witness took a drink check from his pocket
and replied to deceased: "I can; call for your poison." The
drinks were then brought and swallowed, and deceased crossed
to the table at which defendant and Felix DuBoise were sitting.
He threw his arms around defendant and DuBoise and over-
turned the table. Defendant seized the table, a small one, held
it in a position as though he intended to place it on deceased's
head, and said to deceased: "God damn you, boy, behave
yourself or you might get hurt." Sloan soon afterward left
the saloon. A few minutes later Marshal Ragland came in and
inquired for Sloan. On being told that he had gone to Jecker's
saloon, Ragland summoned witness to go with him to find
Sloan. Witness, defendant and Ragland went at once to Jeck-
er's saloon, where they found Sloan, whom Ragland and de-
fendant arrested, and started with to the court house, followed
by the witness and others. Just before the gate of the court
house was reached, the witness saw the defendant draw his
pistol, and heard him ask Ragland if the calaboose was a safe
place in which to confine Sloan. Ragland replied that he did
not think it was safe, when defendant proposed to confine him
in the jail. Reaching the jail, defendant discovered that he did
not have the cell keys, and proposed putting deceased in the
sheriff's office until he could send for the keys. Sloan appealed
to witness and others present to go on an appearance bond for
him in order that he could be released. He was, however,
locked in the sheriff's office, and witness, defendant and others
went back to Jecker's saloon, where defendant asked witness
to write a note to his uncle asking for the keys. The witness
wrote two or three notes before he got one to suit the defend-

ant, which one was despatched by defendant to his uncle, the sheriff, by hands of Luis Garza.

Having despatched the note, the witness and defendant went to Sitterlee's saloon, where, after the lapse of a considerable time, they were told that "the old man"—Sheriff Thurmond—was at the jail. They went at once to the court house, in company with Ragland and Cahill, and found the "old man" storming around, and cursing violently. Witness remained outside the jail, and Ragland, Cahill and defendant went inside. Sheriff Thurmond at once asked them who put that drunk man in his office, and said: "I am ruined. He has burned up important papers that I can't replace." He then turned on defendant and abused him violently for putting Sloan, while drunk, in the office. Sheriff Thurmond finally ordered Sloan "to get out of there." Sloan left the said office in a run, and crossed the court house yard in the direction of the site of the old jail. Soon afterwards Cahill exclaimed: "He is gone," and he and Ragland came out of the jail and looked around for Sloan without finding him. The witness, defendant, Ragland and Cahill then walked off together as far as the court house gate. On reaching the gate the defendant remarked that he was ruined. After passing through the gate, he said to witness: "I've a notion to go and get Sloan; do you think we can get him?" Witness replied: "If any two men can get him, you and I can." Defendant said, "come on," and he and witness left, in pursuit of Sloan. They went from the gate to the northeast corner of the court house square, turned west to Moody street, up Moody street on the east side, to where Perrenot lived, whence they went towards Ashworth's house, the defendant a short distance in advance of witness. About that time the witness discovered a man on horseback near Ashworth's house, and about the same time, or a few moments later, he saw Sloan at or near Mrs. Borden's gate. Defendant, being ahead of witness, crossed the street diagonally to Sloan, seized him with one hand, jerked him around, and snapped a pistol in his face, just as witness reached them. Defendant and witness then started down the street with Sloan. Sloan, who endeavored to keep near witness, asked him what was the matter. Witness replied: "He just snapped his pistol at you." Defendant said: "Yes, God damn you; if it hadn't snapped you would have been in the lowest pit of hell before now!" From near Klein's corner the witness, defendant and Sloan

crossed the street diagonally to Jane Davenport's gate. Sloan seized the gate, and defendant began to jerk him violently, when witness said to him: "Al., for God's sake, don't do that! We are now near the court house; let's go on and lock him up." When they reached Barnes's corner, Sloan began to struggle, and got between witness and defendant. Witness, fearing defendant would shoot through Sloan and wound or kill him, released Sloan and fell to the ground. Sloan then made two or three quick steps towards the Barnes corner, then turned and ran towards defendant with both hands up, exclaiming: "For God's sake, Al., don't do that!" Defendant extended his pistol to touch Sloan's breast, and fired. Sloan stepped across witness's body and fled towards Mrs. Ashworth's house and Coleman's house, and then came back towards defendant, who fired two more shots in quick succession, and Sloan fell off the sidewalk. Defendant then said to witness: "Come, let's go." The witness replied: "No, by God; you go your way, and I'll go mine." They then separated.

Leaving the defendant at the place of the killing, the witness retraced his way over the route he had come as far as Jane Davenport's corner, where he turned south. He went thence two blocks and turned east, and thence three blocks to Main street, and thence up Main street to Sitterlee's saloon, where he found the defendant, and Houston Thompson, John Stratton, Joe Sitterlee and others. Some person remarked that Sloan had been killed, when witness and defendant both replied: "That can't be true; you are joking." The witness denied that defendant then proposed to go and see if Sloan was dead, and that he refused; denied that defendant repeated his proposition, and that he again refused; or that defendant then said: "Well, as you won't go to see about it, may be you are the man that killed him," and that he replied: "Yes, by God, that is what I am, and (exposing his pistol) this is the thing that did it;" nor did he, witness, then ask the parties present to take a drink. Ragland, Cahill and others were present at the court house gate, and were in a position to hear the defendant say that he was going after Sloan. The witness, at the time of the killing, was not in a position to be seen by any person standing at Olnock's gate, nor could a person at Olnock's gate see a person at Jane Davenport's gate. Witness stated before the coroner's jury that he knew nothing about the killing. He was not sworn when he made that statement, or, if he was,

he paid no attention to the oath. On his way to the room in which the inquest was being held, the witness met the defendant, who asked him not to attend the inquest. After making his statement before the coroner's jury, the witness hurriedly left, as it looked like "things were getting too warm" for him. Witness had no misunderstanding with Sloan on the night of the killing. Previous to that time he and Sloan had had frequent misunderstandings, but none of a serious nature. At the time of the killing he and Sloan were on friendly terms. The witness denied that some time subsequent to Sloan's death, he told Henry Jones that the defendant did not know anything about the killing of Sloan, and that he, witness, was glad he did not, as he, defendant, and Sloan were good friends. The witness denied that, while taking a drink with Tom Hathaway on the morning after the killing, he told Hathaway, in reply to Hathaway's invitation to go and see Sloan's body, that he "did not want to see the d—d son of a bitch." Sloan did not say in Sitterlee's saloon, on the fatal night, that he could "whip any d—d son of a bitch who voted for Pridham." He said that he could "whip any d—d son of a bitch who voted *against* Pridham." Witness had never been on friendly terms with sheriff Thurmond, and had always opposed the said sheriff in the elections. The witness admitted that he wore his pistol to the inquest upon the body of Sloan, but did so upon the advice of defendant. He denied that, on the morning after the killing, he met Joe Sitterlee on the street and threatened him if he did not "keep his mouth shut." Some time after the killing of Sloan, the witness had a conversation with defendant in which defendant said: "I have killed three or four men, but I gave them all a fair chance, except Sloan; and I hope Sloan is now roasting in hell." Witness had testified in this case three different times, but had never before testified to the above statement made by defendant. He was never asked directly about it, although he was always directed to tell all he knew about the killing. Witness suppressed the truth about the killing of Sloan because he was afraid to tell the truth about it. Witness, on the night of and after the killing, started to relate the facts to Ragland, but the defendant joining them, abandoned the purpose. The witness and Sloan did not quarrel in Sitterlee's saloon on the night of the killing.

Eugene Sloan, the brother of the deceased, testified, for the State, that he last saw deceased alive on the evening of Janu-

ary 3, 1887, in Sitterlee's saloon. At the time of the killing, the defendant had the deceased's pistol, which he borrowed some months before. On the morning after the deceased was killed, the witness went to the defendant and asked him for his brother's pistol. Defendant said that he could not then surrender it, but that witness could go to Sitterlee's saloon and get his, defendant's, pistol, which deceased had left there. A day or two afterwards witness got deceased's pistol from defendant. That pistol was a weapon of forty-five calibre. Witness had one of the balls taken from the body of the deceased. It was the ball which inflicted the wound in the thigh. That ball not having struck any of the bones, it was not in the least battered. It fitted the deceased's pistol perfectly. Deceased, when killed, had on a "stockman" hat. That hat showed a bullet hole corresponding in location with the bullet hole in the head of deceased. The breast of the deceased's coat was powder-burned. Witness slept at the house of his mother on the fatal night, which house was situated three or four blocks distant from the court house. He did not hear of the killing until next morning.

James Mumford testified, for the State, that he had occasion to pass the court house on the fatal night, and in doing so his attention was attracted by confusion that prevailed in the jail, —the sheriff's voice being particularly distinct. Soon after his attention was first arrested by the noise, the witness observed a man approaching him from the direction of the court house fence. That man passed the witness at a short distance, and spoke to him, witness recognizing him by his voice as the deceased. Deceased then came up to witness, who was on horseback, and asked witness to let him ride behind the witness. Witness cautioned the deceased, who was evidently under the influence of whisky, to be careful about getting too near the horse, and told him that the said horse, being young, wild and unbroken, would not carry double. Deceased then offered witness a drink of whisky from a bottle he had, and remarked: "They jugged me and got my pistol, but didn't get my whisky." Deceased then walked alongside of witness's horse until they got near Mrs. Ashworth's house, when deceased yelled. Witness then quickened the gait of his horse, and got a short distance ahead of deceased, when he observed the approach of two men. Not knowing the two men, but fearing they might be marshals and arrest him as a participant with the deceased

in disorderly conduct, the witness rode on. One of the men walked up to and seized Sloan, and walked with him back to the other man, who was in the middle of the street between the houses of Mrs. Ashworth and Dr. Sutherland. Witness distinctly heard Sloan say: "I will go with you anywhere." The man who first got with Sloan and seized him did not jerk him round, and snap a pistol in his face, so far as the witness saw. The witness did not see either of the men have a pistol. The three parties, from where witness last saw them, went down the street, and the witness went on home. Witness knew both the defendant and R. L. Owens, but did not recognize either of them as one of the men who arrested Sloan. From the place where the witness last saw the parties he had gone a little further than a block when he heard the shots. While traveling with the witness, Sloan was on his way to his mother's house, and had nearly reached it when he was overtaken by the parties. He was overtaken by those parties at a point near Mrs. Borden's gate.

Jane Davenport was the next witness for the State. She testified that she was at home at the time of the killing of Sloan. Her husband and Solomon Gibson, a few minutes before the killing, were engaged in playing a game of cards, and witness and Larkin Moore were seated at or near a stove, talking, the witness with her head resting on her hands. A few minutes before the shots were fired the witness heard voices of some parties running from the direction of Mrs. Borden's house toward her house.

Presently the fence attached to witness's house was shaken, and a voice said: "Al., don't! Don't, Al." The witness did not recognize the voice, but said to her husband: "Go out and see that Al Daniels does not bring that drunk man in here." Al. Daniels was a negro who, under the influence of liquor, had been at witness's house that evening, and the words spoken induced witness to believe that he had returned. Louis Davenport did not go out of the house. Within a very few minutes thereafter the witness heard three shots fired at or near B rnes's corner, which was the northeast corner of the block n which witness lived—her house occupying the northwest corner. Just before the shots were fired the witness distinctly heard the words: "Let me say my last prayer." Those words were spoken at or about the place where, a moment er, the shots were fired.

C. L. Thurmond, Sr., was the next witness for the State. He testified that he was sheriff of Victoria county at the time of the killing of Sloan. On that night he received a note from defendant, his nephew, stating that Sloan, drunk and disorderly, was in his custody, and that, as the calaboose was unsafe, he wanted the jail keys in order to get Sloan in jail. Witness got up and went to the jail. As he approached the jail he heard the smashing of windows in the jail office, and when he got into that office he found that some books and papers had been thrown into the fire and were burning. Witness then directed his energies toward saving such of the books and papers as were not yet entirely consumed, and while thus engaged the defendant, with Cahill, Ragland and others, came to the jail office. Witness, who was enraged about the burning of his books and papers, asked defendant why he had confined a drunk man in his private office, scolded him for doing so, demanded the keys, with the remark that no man with so little discretion could be entrusted with them, and finally told him that he had no further need for his, defendant's, services. While the witness and defendant were stamping out the flames, and thereby creating some confusion, Sloan slipped out, and soon afterwards somebody—witness thought it was Cahill—remarked: "Boys, he's gone." The several parties then left, and witness began to search for a bundle of important papers which pertained to a large land suit, and which he feared was among the papers burned. He found them after a short search, and then closed and locked his office and started home. Reaching the northeast corner of the public square, and remembering that the defendant's note stated that Sloan and all of the marshals were drunk, he concluded to go down town and see if there were any disturbances going on. When he got in front of Jecker's saloon on the south side of the public square, he heard three pistol shots fired. He saw the flashes from the last two shots. He then returned to the court house, where he was soon joined by Ragland and Cahill. Those two parties then went off in the direction of Barnes's corner, and soon one of them hallooed to witness that Sloan was lying in the road, dead. Witness called to them not to touch the body, and immediately went to it himself. The witness and Cahill and Ragland then examined the body and the ground around it for weapons, but found none. Witness then sent for the coroner, who came, viewed the body, had it removed to the court house

and adjourned the inquest until the next day. The pistol shots, judging from the flashes, were all fired from the same position, and either from the north to the south or the south to the north. There was a short interval between the first and second shots, but not long enough to have enabled a man to run across the street between the two said shots. The second and third shots were fired with a barely perceptible interval of time—just enough to distinguish two shots and to indicate that if fired by one man, they were fired from a self acting pistol. They were fired too near together to have been fired by a man who had to cock the weapon with his hand or thumb. Defendant was generally called Al. Sloan fell with his head pointing south and his feet north.

George Williams testified, for the State, that he was in Sitterlee's saloon on the fatal night, but before the shooting occurred. Sloan was in that saloon, drunk, and was making a Mexican play a guitar and dance. While in that saloon Sloan said that any man who voted for Pridham was a son of a bitch. He afterwards said that any man was a son of a bitch who did not vote for Pridham. Defendant and R. L. Owens, a brother-in-law of Pridham, were in the saloon at the time. The witness got Sloan's pistol away from him and gave it to the bar keeper. He afterwards saw Sloan trying to get a pistol from the defendant.

James Brown was the next witness for the State. He testified that, late one evening either in November or December following the killing of Sloan, he went to Sitterlee's saloon in the town of Victoria, in front of which saloon he found the defendant abusing R. L. Owens. Witness got Owens and took him down the street to Heaton's store, and then returned to the defendant, with whom he walked as far as the corner of Main street. On that walk witness asked defendant: "Why were you abusing Owens? In a little while more you would have hurt him." Defendant replied: "No, I do not want to hurt the cowardly son of a bitch. On the night of the shooting he fainted and fell over, and I had it all to do." This meeting and conversation occurred subsequent to the indictment of defendant for the murder of Sloan, and while he was on bail. The witness and the defendant were not on friendly terms. They had had two difficulties, in one of which they exchanged shots. The first of those difficulties occurred some time before the defendant made the above statement to witness, and prior to the

previous trial of this defendant, which occurred in June, 1888, and at which trial the witness testified. On that trial the witness testified that he did not have a pistol on his person at the time of the said difficulty with defendant in Sitterlee's saloon, which said testimony was not true, as he did have on a pistol that night. He did not know why he testified on the defendant's former trial that he was not armed at the time of the said difficulty with defendant. The second difficulty between witness and defendant in which they exchanged shots likewise occurred prior to the trial in June, 1888, of the defendant. Witness was friendly with both defendant and Owens in November and December, 1887, and interposed in their said quarrel to keep down trouble. Witness was on good terms with Owens, but could not be said so be on particularly friendly terms with him. He did not associate with Owens to any great extent; did not like to be seen with him, and as a rule avoided him as much as possible. The witness never told anybody about what defendant said to him after abusing Owens as stated, except R. L. Owens, F. R. Pridham and John Powers, and he charged each of them not to repeat it, as he did not want to appear as a witness in this case.

The State rested.

The defense recalled T. A. Cahill as its first witness. He testified that he was one of the jury of inquest which sat upon the body of Sloan. R. L. Owens testified before that inquest that he knew nothing whatever about the killing of Sloan. The witness was a member of the party which accompanied defendant and Ragland to the jail with Sloan on the fatal night. If, at the court house gate, en route to that jail, the defendant drew his pistol at that time and place, he, witness, would have seen it. Defendant did not draw his pistol at any time or place while he and Ragland had Sloan in custody and were taking him to jail. If at the court house yard gate the defendant proposed to Owens to follow and catch Sloan, and Owens replied, "If any two men can catch him we can," the witness did not hear it. The witness did not see defendant and Owens leave the court house fence to overtake Sloan. It was his impression that defendant and Owens followed him, witness, and Ragland to town. When witness last saw defendant and Owens before the killing, they were standing at the court house gate with Luis Garza. The witness knew Jane Davenport, and knew her reputation for truth and veracity. It was infamous, and she

was totally unworthy of belief under oath. Ex-county judge of Victoria county, Coleman, corroborated the testimony of Cahill as to the reputation for truth and veracity of Jane Davenport.

Ed Sitterlee was the next witness for the defense. He testified that he was one of the proprietors of Sitterlee's saloon, in Victoria, Texas. The witness was up stairs over his saloon during the earlier part of the fatal night. He was notified that a disturbance was being created in his saloon, and soon afterward went down stairs. Sloan had then left, but parties present, including R. L. Owens, gave witness an account of his recent conduct. The witness then sent word to Ragland that Sloan was drunk and disorderly. He then went behind the bar and was looking under it, when Owens came to him and said: "Are you looking for a pistol? If you are, here is mine; take it." Ragland soon reached the witness's saloon, and he and the defendant left together. They had been gone but a few minutes when the witness walked to the corner of the street, from which point he saw Ragland and defendant taking Sloan from Jecker's saloon toward the calaboose in the court house yard. Witness followed them and saw all that occurred from that time until Sloan was put into the sheriff's office. He did not see the defendant draw a pistol at any time or place between Jecker's saloon and the sheriff's office. When they reached the sheriff's office Sloan appealed several times to witness and others to become bail for his appearance next day, in order that he might not be put in jail. The witness had known the defendant and Sloan for years, during all of which time they associated closely and appeared to be particularly intimate friends. The witness had also known R. L. Owens for several years, and he knew that, at times, at least, the said Owens and Sloan were not on good terms. He knew personally of several quarrels between them. The witness knew the State's witness James Brown, and knew that he and the defendant were not on friendly terms. He did not think they had been friendly since their first difficulty, of which Brown testified. Witness also knew Jane Davenport, whose reputation for truth and veracity he knew to be so bad that she was not entitled to credit on oath.

Louis Sitterlee testified, for the defense, that he was one of the proprietors of Sitterlee's saloon in Victoria, and was in his saloon on the night of the killing. Sloan was in that saloon

conducting himself in a disorderly manner, when witness asked defendant to preserve order. During the evening Sloan and Felix DuBoise got to scuffling in the billiard room and overturned a table. The witness saw both difficulties between the defendant and the State's witness Brown, about which Brown testified. During the first quarrel referred to, defendant, who was standing at the end of witness's counter, said something about having his thumb greased. Brown, pulling up his vest and exposing a pistol in the waistband of his pants, replied: "I would like to see the color of the man's hair who can get there quicker than I can." Somebody present pushed Brown out of the door, when defendant handed witness his pistol, remarking: "I don't want a fuss; put my pistol away." At the next difficulty between defendant and Brown, shots were exchanged, defendant shooting from the inside and Brown from the outside of the saloon. The witness knew that defendant and Sloan were friends, but knew nothing about the personal feeling between Owens and Sloan.

Ed. Hathaway testified, for the defense, that one evening, a few days prior to the killing of Sloan, he and Sloan took a seat in a door at Schwartz's corner. Owens passed without speaking while they were sitting there, and Sloan remarked: "Owens is the only enemy I have in Victoria, and I am afraid that he and I will have trouble some time." The witness had often before heard Sloan speak of Owens being at enmity with him, and he had often heard him, Sloan, speak of the friendship existing between himself and the defendant.

Tom Hathaway testified, for the defense, that he met R. L. Owens on the streets of Victoria, between six and seven o'clock, on the morning after the killing, and went with him to a saloon to get a drink. While standing at the bar the witness, who had just heard of the killing, proposed to Owens to go and see Sloan's body. Owens replied: "I don't want to see the damned son of-a-bitch."

George Williams testified, for the defense, that while he was in Sitterlee's saloon on the fatal night he heard Owens and Sloan at the bar counter, quarreling. They appeared to be quarreling about the spilling of some whisky. Owens said to Sloan: "It was a damned dirty trick," or "you did me a damned dirty trick"— the witness was not certain which. Owens made some other angry remarks, which witness could not now recall.

Henry Ragland was recalled by the defense, and testified that, judging by their close association, he considered the defendant and Sloan, up to and including the time he last saw them together, to be good friends. The feeling between Owens and Sloan, to judge from appearances, was alternately good and bad. They had several quarrels to the personal knowledge of the witness. Owens testified, under oath, before the coroner's jury, that he knew nothing whatever about the killing of Sloan. He repeated that declaration under cross examination by the jurors.

Joe Sitterlee testified, for the defense, that he and John Stratton were in Sitterlee's saloon, playing billiards, on the fatal night, when somebody came into the saloon and reported the killing of Sloan. Defendant, Owens and others were present. Somebody remarked: "It can't be true that Sloan is dead.". Defendant then proposed to Owens: "Let's go and see if it is true." Owens refused to go. Defendant repeated his proposition, and Owens again refused, when defendant remarked to him, Owens: "Since you refuse to go and see about it, perhaps you are the man who killed him." Owens replied: "By God, that's what I am; and (exposing his pistol) here is the thing that did it." He, Owens, then staggered to the bar, and called the crowd to drink with him. Speaking to witness, Mr. Stratton said: "Let's get out of here," and he and witness left. Meeting Owens on the next morning, Owens said to witness: "You had better keep your mouth shut. Some cases are yet standing against you, and me and my friends can break your neck." Stratton corroborated this witness as to the conversation between defendant and Owens in the saloon.

Henry Jones testified, for the defense, that soon after the killing of Sloan, and before the indictment of the defendant, he met Owens in a saloon in Victoria, and said to him: "Lee (Owens), some people seem to think that Al. Thurmond had something to do with, or knows something about, the killing of Sloan." Owens replied: "No, Al. knows nothing about it, and I am damned glad he doesn't, as he and Sloan were friends."

Allen Nelson testified, for the defense, that, on the evening of the Sunday preceding the killing of Sloan, the said Sloan, witness and defendant were sitting together on the court house steps. Owens's name was mentioned, when Sloan remarked: "I have heard that Owens has said that the next time I get

drunk and make a play at him he will take me in.  I am on a spree now, and I believe I will go down and tackle him and see if he will take me in." Defendant said to Sloan: "You had better let Owens alone; he might fool you." Sloan replied: "He is not quick enough," and went down the street. The witness knew as a matter of fact that defendant and deceased were on particularly friendly terms.

C. L. Thurmond, Jr., testified, for the defense, that he was the son of the sheriff of Victoria county, and was himself a deputy sheriff of that county, and held that position during the time the defendant was confined in jail on the charge of killing Sloan.  A day or two after the arrest of the defendant, the State's witness James Brown came to the jail and requested an interview with defendant.  Witness told defendant that Brown wanted to see him, and advised him to have nothing to say to or do with Brown, as he did not think Brown was friendly to him.  Defendant replied that he did not want Brown admitted unless accompanied by a sheriff or deputy sheriff. Brown never afterward called at the jail to see defendant.

Dick Klamberg testified, for the defense, that he saw the officers taking Sloan to jail on the fatal night, and a half or three-quarters of an hour later saw the defendant standing on Schwartz's corner. Nobody was then with defendant. Witness knew as a matter of fact that defendant and the State's witness Brown were not friends, and had not been friendly since their first difficulty in Sitterlee's saloon. The State's witness Brown and Owens were good friends, so far as appearances go. They associated with each other a great deal, and the witness had often seen Brown go to the store of Owens's brother, hunting Owens. Brown always appeared to witness to hunt for Owens as an associate, and never to avoid him.

Kate Coleman testified, for the defense, that on the night of and a short while before the killing, Sloan came to her house and asked for Judge Coleman. He said that he had just escaped from jail and wanted protection; that Owens and another man, whom he did not name, were after him, and he was afraid they would kill him. Witness tried to get him to bed in her house, but he refused to go into the house, and left, saying he was going home to see his mother. During the time that witness and Sloan were talking at the gate, a man, whom the witness distinctly recognized as R. L. Owens, passed rapidly on the opposite side of the street. When Owens reached Silas's corner

Sloan left the witness in a run toward Barnes's corner. Witness then went into the house, and had taken off her shoes, laid down and covered up when she heard the shooting. The witness testified on the examining trial of Owens, but did not state on that trial that in the man who passed her house on the opposite side of the street she recognized Owens, because she was not asked if she recognized the man. When witness last saw Sloan he was at or near Barnes's corner, in a run. Barnes's said corner was distant from witness's house the length of a block and the width of a street. The Olnock house was across the street from the Barnes corner.

Gus Albrecht testified, for the defense, that he was an eye witness to the killing of Sloan, viewing it from Mrs. Olnock's gate, which was across the street, northwest from the northwest corner of the public square. The witness had been standing at that gate fifteen or twenty minutes when he saw Sloan running towards the Barnes corner from the direction of Kate Coleman's house. About the same time he saw R. L. Owens approaching the Barnes corner from the direction of Jane Davenport's house. Owens and Sloan met at the Barnes corner, when Owens said to Sloan: "By God, I have got you now!" and drew a pistol from his overcoat pocket. Sloan said: "I know, Mr. Owens, that you are going to kill me, but for God's sake let me say my last prayer." The words had scarcely passed Sloan's lips when Owens fired. Sloan fell, and Owens in a very few moments fired two more shots into the prostrate body, and left, going back over the route he had come. The defendant was not present at the killing, nor was any other person present or near, that the witness saw. The distance intervening between the witness and Owens and Sloan at the time of the shooting was the width of the street. The witness knew Owens well, and recognized him by the outline of his figure, his voice and, at the flashes of the pistol, by sight. He had, however, recognized him before he reached the corner. The moon, although occasionally obscured by floating clouds, was shining.

Continuing his testimony this witness said that he was at Mrs. Olnock's gate to meet a negro girl with whom, earlier in the night, he had made an appointment. Immediately after the shooting the witness went home over a route the meanders of which he detailed. It was then a little after eleven o'clock. He fixed the hour by the fact that, while standing at

Mrs. Olnock's gate he heard her clock strike eleven. The witness went to bed immediately, on reaching home, sleeping with his brother. He did not go to town on the day following the killing, but went on the day succeeding that, and met Joe Sitterlee on the street, to whom he divulged the circumstances of the killing. Joe Sitterlee then called deputy sheriff C. L. Thurmond, Jr., who went with witness to a magistrate, where a complaint charging Owens with the murder of Sloan was filed. The witness was at Buck Bates's house about nine o'clock that night, but remained a short time only. From Bates's house he started to the railroad section house, about two miles north of town, and was on his way to the section house when he met the negro girl and arranged to meet her at Mrs. Olnock's gate and go home with her. It was not true that witness slept at Bates's house, with George Bates, on the night of the killing, and was in bed with George Bates when the shots were fired, and was awakened by George Bates and asked by him if he heard the shooting. It was about nine o'clock when witness left Bates's house, and it was about half-past twelve when he got home. He did not, on reaching home, tell either his brother or mother about seeing Owens kill Sloan. He got up next morning and ate breakfast with his mother and brother, but did not go to town on that day. When Sloan fell, his head lay east. Owens then, without changing position, fired two more shots.

The defense rested.

George Bates was the first witness called by the State in rebuttal. He testified that he lived at the house of his aunt, Ann Bates, between a half and three quarters of a mile distant from the Barnes corner where Sloan was killed. Gus Albrecht slept with the witness in the house of the said Ann Bates all night, of the fatal night. He came to the house between seven and eight o'clock, remained all night and left between seven and eight on the next morning. The shots which killed Sloan aroused the witness, and he waked Albrecht and asked him if he heard the shooting. Witness heard other shots on that night, but paid no attention to them.

Jake Wertheimer, Ed Sitterlee, Louis Sitterlee, Ragland and Cahill, as impeaching witnesses for the State, testified that the reputations of Gus Albrecht and Kate Coleman, for truth and veracity, in the neighborhood of their residence, were bad.

John Power, Buck Power and Dave Emerson were then called by the State as witnesses to support the reputation, for

truth and veracity, of the State witness James Brown. The predicate established by these witnesses is the subject matter of the ruling of this court as announced in the second head note of this report. They testified that they lived in the Mission Valley neighborhood in DeWitt county, and that, for several years, until about eighteen months before this trial, James Brown lived in the said neighborhood, during which time they knew him well. During his said residence in the Mission Valley neighborhood, the reputation for truth and veracity of the said witness Brown was above reproach. They did not know what reputation in this respect the said witness has borne in Victoria county during the eighteen months of his residence in that county. Emerson further testified that he and R. L. Owens slept together at Owens's father's house on the night of the killing. When witness got up for breakfast about eight o'clock he waked Owens, but Owens did not get up. The State closed.

Mrs. Albrecht and Valentine, the brother of the defense witness Gus Albrecht, testified, for the defense, in the most positive and circumstantial manner, that the said Gus Albrecht came to his said mother's house between twelve and one o'clock on the fatal night, and went to bed and slept with Valentine Albrecht throughout the said night.

John Harris testified, for the defense, that he passed Barnes's corner about eleven o'clock on the night Sloan was killed, and in passing the said corner saw Gus Albrecht standing at Mrs. Olnock's gate. When he reached the east side of the court house square the witness met the negro girl Harriet Johnson, who asked him if he knew where Gus Albrecht was. Witness told her that Gus was then standing at Mrs. Olnock's gate. He then went to Jecker's saloon, and had about reached that saloon when he heard three shots fired at or near the Barnes corner.

The charge of the court referred to in the sixth head note of this report reads as follows: "III. If the jury believe from the evidence that the deceased was unlawfully killed by the defendant, as charged in the indictment, and that the witness Lee Owens was present, and, knowing the unlawful intent of the defendant, did aid by act, or encourage by word or gesture the defendant in the commission of the offense; or, if they believe that the deceased was unlawfully killed, as charged, by the defendant, and that the witness Owens, knowing that the

defendant had committed the offense, did in any manner aid the defendant to escape arrest or trial—in either case the testimony of Owens will not be sufficient to justify the jury in convicting the defendant, unless the jury believe that the testimony of said witness is corroborated by other evidence of some material fact or facts tending to convict (connect?) the defendant with the commission of that offense; and the corroboration is not sufficient if it only shows that the offense has been committed; but, to be sufficient, the corroborative evidence must tend to connect the accused with the commission of the offense. This rule of law, however, does not require that the corroboration itself, disconnected with the testimony corroborated, shall establish the guilt of the accused."

*A. S. Thurmond* filed an able and elaborate brief and argument for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This conviction is for murder in the second degree, with fifteen years imprisonment in the penitentiary assessed as punishment.

The indictment was presented in the district court of Victoria county. That court, of its own motion, sent the case to De Witt county. After this order was made, but on the same day, appellant moved to vacate it, and requested the court to send the case to some other county, upon the ground that there existed in De Witt county a combination of influential persons against him, etc. This motion was overruled and appellant excepted.

In this there was no error. The change of venue being made by the court on its own motion, and not at the request of the appellant, when the cause was called for trial in De Witt county, if there existed any ground for a change of venue from that county, appellant could bring it forward; he was not deprived of this right by the order made in the first instance.

The witness Brown testified to confessions of appellant. The State introduced several witnesses who swore that his reputation was good. Appellant objected on the ground that the witnesses did not qualify themselves to speak to his reputation, etc. The facts were that the sustaining witnesses for years lived in the same neighborhood with Brown, and so lived until

eighteen months before the trial, at which time Brown moved to Victoria. Under these facts the witnesses were competent to speak to the reputation of Brown, notwithstanding he had moved out of their neighborhood and had been in Victoria for eighteen months.

We also hold that Wertheimer, Ed Sitterlee, Cahill, and Louis Sitterlee show themselves competent to speak to the character of Albrecht.

Appellant's sixth assignment is: "That the court erred in failing to instruct the jury upon the law governing impeaching testimony." We do not think, unless it be under extraordinary or peculiar circumstances, that it would be necessary or even proper for the court to charge the jury upon this matter. Such a rule was announced in Henderson's case, 1 Texas Court of Appeals, 432, but the rule has never been enforced indiscriminately, and its correctness as a general one is, to say the least of it, questioned in Rider's case, 26 Texas Court Appeals, 334.

The witness Albrecht swore that he saw the killing; that Owens, and not appellant, shot and killed deceased, and that appellant was not present when the killing occurred. The State proved by several witnesses that Albrecht's character for truth was bad. Appellant offered to prove that, on the examining trial and at other times, he swore to the same facts. Objection by the State was sustained, and defendant reserved his bill. In this there was no error. (1 Whart. Ev., 570, 571.) Williams v. The State, 24 Texas Court of Appeals, 637, is not in point.

The eighth assignment is that the court erred in failing to instruct the jury that, if they believed that Owens killed deceased, or if they had a reasonable doubt whether or not Owens killed deceased, they should acquit defendant. The cases cited in support of this proposition are not in point, except Black v. The State, 1 Texas Court of Appeals, 368, and in that case the charge was requested and refused. In King v. The State, 9 Texas Court of Appeals, 515, it is held that if the reasonable doubt is applied to the whole case, that will suffice.

Ninth assignment: "The court erred in failing to charge all the law relating to the necessity of corroborating a witness who was an accomplice." The court's charge upon this subject was full, correct and applicable.

The tenth assignment is that the court erred in charging the jury "that they might convict defendant if they believed from

the evidence that the witness Owens killed deceased, and that defendant was present, and, knowing the unlawful intent of Owens, did aid him by act or encourage him by word or gesture in the commission of the offense." The objections to this charge are, first, that there is no allegation by the State of this state of facts. Answer to this: None were required. Second. That there was no evidence warranting this charge. Answer: There were cogent facts demanding this charge.

Eleventh assignment: "The court erred in refusing to give the following at the request of defendant: 'You are further instructed that, if you believe from the evidence that the witness Owens was testifying to save himself from punishment or moral obliquy of guilt, then his testimony can not be convicted upon, unless corroborated as the evidence of an accomplice.'"

There was no error in refusing this charge. In fact, the charge of the court is correct in every particular, being a clear and pertinent application of the law to every phase of the case.

There was no error in overruling the motion for new trial. The witness Owens was very strongly corroborated by the attending circumstances, as well as by the testimony of several witnesses to distinct facts, quite corroborative in their character.

We have found no error in the matters complained of by appellant, nor any other for which the judgment should be reversed, and it is affirmed.

*Affirmed.*